IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Antonis W.,[1]                    )        C/A No.: 1:20-2379-SVH
                                  )
              Plaintiff,          )
                                  )
        vs.                       )
                                  )              ORDER
Andrew M. Saul,                   )
Commissioner of Social Security   )
Administration,                   )
                                  )
              Defendant.          )
                                  )

     This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated July 7, 2020, referring this matter for disposition. [ECF No. 6]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 5].

     Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On November 20, 2017, Plaintiff filed an application for DIB[2] in which he alleged his disability began on December 30, 2014. Tr. at 162, 296–97. His application was denied initially and upon reconsideration. Tr. at 181–84, 186–89. On February 26, 2020, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Joshua Vineyard. Tr. at 32–98 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 25, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 23, 2020. [ECF No. 1].

---

[2] Plaintiff filed a prior application for DIB on December 8, 2016, that was denied on March 15, 2017, without appeal. Tr. at 548. Prior to the hearing, Plaintiff's counsel requested that the prior application be reopened. *See id.* The ALJ referenced only the November 20, 2017 application in his decision, Tr. at 15, failing to address Plaintiff's request to reopen the prior application.

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 45 years old at the time of the hearing. Tr. at 46–47. He completed a master's degree. Tr. at 47. His past relevant work ("PRW") was as a diesel mechanic, a diesel mechanic supervisor, a survival specialist, and a field artillery operations specialist. Tr. at 88–89. He alleges he was unable to work from December 30, 2014, through May 17, 2018. Tr. at 43.

2.    Medical History[3]

Plaintiff presented to Keith P. Madsen, M.D. ("Dr. Madsen"), for left shoulder and right ankle pain on July 11, 2014. Tr. at 691. He indicated he had undergone six weeks of physical therapy for his left shoulder and continued to have pain with certain movements, despite some improvement. *Id.* He endorsed continued right ankle pain after having sprained it two months prior. *Id.* Dr. Madsen noted weakness of the left shoulder on supraspinatus testing, tenderness to palpation ("TTP"), and pain with motion and during Neer and Hawkins-Kennedy impingement tests. Tr. at 692–93. He cited TTP of the plantar calcaneus of the right ankle and severe pes planus of the right foot. Tr. at 693. He assessed flat foot, ankle sprain, rotator

---

[3] The record in this case encompasses 9,512 pages. In addition to the evidence summarized below, the record contains weekly nurse case management notes and numerous social work, primary care, and physical and occupational therapy notes that the undersigned declines to summarize. The undersigned also declines to summarize records for the period following the alleged period of disability.

cuff tendinitis, and hypertension and referred Plaintiff to the physical medicine and rehabilitation clinic. Tr. at 693–94.

Plaintiff was assigned to the Warrior Transition Battalion Wounded Warrior Program ("WTB")[4] at Fort Gordon on December 30, 2014. Tr. at 303. Pursuant to this assignment, he was placed on limited duty until he retired from the military on March 15, 2018. *Id.*

Plaintiff was examined by Rajesh M. Patel ("Dr. Patel"), upon transfer to Fort Gordon on December 30, 2014. Tr. at 1629–34. Dr. Patel noted TTP and abnormal and painful motion of the left shoulder. Tr. at 1631. He recorded TTP and pain with motion of the right ankle on ambulation. *Id.* He assessed left shoulder arthralgia, right ankle joint pain, hyperlipidemia, and hypertension and prescribed ibuprofen 800 mg. Tr. at 1634.

Plaintiff underwent magnetic resonance imaging ("MRI") of the right ankle on January 6, 2015, that showed small cysts in the medial neck of the talus and small tibiocalcaneal joint effusion. Tr. at 4359–60.

Plaintiff presented to Dell Andrew Hulse, PA ("PA Hulse"), for an orthopedic consultation as to left shoulder pain on January 13, 2015. Tr. at 3326. He indicated physical therapy, injections, and a TEN-ex procedure had

---

[4] The WTB "provides leadership, primary care, complex case management, and comprehensive transition planning in support of wounded, ill, or injured [] soldiers." *Pendergrass v. U.S. Department of Defense*, C/A No. 17-546 (KBJ), 2020 WL 5406043, at *5 (D.D.C. Sept. 9, 2020) (citing *Warrior Transition Brigade*, U.S. Army, wwcc.capmed.mil/WTB/SitePages/Home.aspx (last visited Apr. 2, 2020)).

provided only short-term benefits. *Id.* PA Hulse noted reduced range of motion ("ROM") of the left shoulder, positive Neer's and Hawkin's signs, negative O'Brien's sign, positive cross chest sign, and TTP over the acromioclavicular ("AC") joint and lateral cuff. Tr. at 3328. X-rays showed a sloped acromion with undersurface spurring and AC joint arthritis. *Id.* An MRI showed AC joint arthritis with the acromion and spurring undersurface, as well as evidence of a partial thickness tear in the supraspinatus consistent with impingement. *Id.* PA Hulse assessed AC joint arthritis and shoulder impingement/cuff tendinitis with a partial thickness rotator cuff tear. *Id.* He discussed surgical and nonsurgical treatment options, and Plaintiff requested to follow up with an orthopedic surgeon. *Id.*

Plaintiff presented to orthopedic surgeon Stephen Parada, M.D. ("Dr. Parada"), on February 2, 2015. Tr. at 1571. Dr. Parada noted TTP about the AC joint and bicipital groove and 4/5 strength with resisted abduction and external rotation. Tr. at 1572. He recorded positive Speed's and O'Brien's tests and pain with drop arm and empty can tests. *Id.* He stated an MRI demonstrated AC joint arthritis and partial thickness supraspinatus tear. *Id.* He assessed left shoulder partial thickness supraspinatus tear, AC arthropathy, and biceps tendinopathy. *Id.* Plaintiff opted to proceed with surgery, given his failure to progress with nonoperative therapy. *Id.*

On February 25, 2015, Dr. Parada performed left shoulder arthroscopic rotator cuff repair, arthroscopic versus open AC joint debridement, and open subpectoral biceps tenodesis. Tr. at 2934, 3398–3406.

On March 11, 2015, Plaintiff reported seeing slight yellow discoloration on his shirt three days prior, but denied subsequent drainage from his incision site. Tr. at 1522. Dr. Parada observed no edema, ecchymosis, induration, fluctuance, or drainage. *Id.* He indicated Plaintiff's sutures were intact and he had no signs of infection. *Id.* He planned to wean Plaintiff from narcotics and indicated he should engage in no active strengthening until 12 weeks after surgery. *Id.*

On April 14, 2015, Dr. Parada stated Plaintiff was progressing well with physical therapy. Tr. at 1480. He noted Plaintiff was neurovascularly intact and had forward flexion to 110 degrees and well-healed incisions without keloid formation, erythema, fluctuance, or effusion. *Id.* He stressed the importance of ROM exercises and instructed Plaintiff on how to perform them. *Id.*

On June 15, 2015, Plaintiff described left shoulder pain that ranged from a one to a four. Tr. at 1426. He reported improved ROM with physical therapy. *Id.* Dr. Parada assessed post-surgical stiffness and recommended additional stretching exercises. *Id.*

On August 17, 2015, Dr. Patel noted TTP of the left shoulder and right ankle, pain with motion of the left shoulder and right ankle, and TTP to the left ankle on ambulation. Tr. at 2772.

On August 25, 2015, Plaintiff endorsed no resting shoulder pain, improving stiffness, and progressing with physical therapy. Tr. at 1974. Dr. Parada noted forward flexion to 120 degrees, external rotation to 45 degrees, and well-healed incisions and indicated Plaintiff was neurovascularly intact. *Id.* He stated Plaintiff could return to "previous duties such as office-type work including his previous [military occupational specialty] of human resources or controller specialist." *Id.* He did not consider Plaintiff capable of resuming work as a mechanic and continued a no push-ups, no sit-ups profile. *Id.*

Plaintiff presented to orthopedist Jeannie Huh, M.D. ("Dr. Huh"), for evaluation of right foot and ankle pain on October 29, 2015. Tr. at 879. He reported having injured his right ankle in April 2014, when he stepped in a hole while running. *Id.* He described constant, dull pain that worsened with weightbearing activities and was associated with swelling and intermittent instability. *Id.* Dr. Huh observed antalgic gait without use of an assistive device, soft tissue edema, too many toes sign, localized tenderness, decreased ROM, 4/5 peroneal strength, significant fixed forefoot varus deformity, intact sensation, and palpable pulses. Tr. at 880. She reviewed x-rays and an MRI.

7

Tr. at 881. Dr. Huh assessed right posterior tibial tendon dysfunction with pes planovalgus deformity, resulting in subfibular impingement. *Id.* She discussed treatment options with Plaintiff, giving him a trial of orthotics and placing him in physical therapy. *Id.*

On November 24, 2015, Plaintiff reported progressing well as to shoulder rehabilitation with physical therapy and rated his left shoulder pain as a one to two of 10. Tr. at 850. Dr. Parada instructed Plaintiff to continue with physical therapy and to follow up in March. *Id.*

Plaintiff followed up with Dr. Huh the same day for right ankle pain. Tr. at 851. He reported only minimal improvement with physical therapy and orthotics and continued to endorse daily pain and swelling in his hindfoot and midfoot. *Id.* Dr. Huh observed Plaintiff to ambulate with antalgic gait and without use of an assistive device. Tr. at 852. She noted tenderness, decreased peroneal strength, reduced ROM, and soft tissue edema about the midfoot. *Id.* She advised Plaintiff of the surgical options, and he requested time to research them prior to proceeding. Tr. at 853.

Plaintiff presented to Charles John Ussery, M.D. ("Dr. Ussery"), for an intake appointment on February 24, 2016, after having been transferred from Fort Gordon to Fort Stewart. Tr. at 809. He endorsed constant right ankle pain that he rated as a seven. *Id.* Dr. Ussery recorded normal exam findings. Tr. at 812.

On March 9, 2016, Plaintiff presented to Jay Brandon Cook, M.D. ("Dr. Cook"), in the orthopedic clinic at Fort Stewart. Tr. at 2550. He continued to endorse right ankle and foot pain and reported only slight improvement with insoles. *Id.* Dr. Cook recommended that Plaintiff follow up with Dr. Huh at Fort Gordon. *Id.*

On March 26, 2016, Plaintiff rated his left shoulder pain as a one to two and denied complaints. Tr. at 745. Dr. Parada stated Plaintiff had made great improvement in his ROM. *Id.* He noted intact sensation, forward flexion to 150 degrees, external rotation with elbow at side to 55 degrees, external rotation in abduction to 80 degrees, and symmetric appearance of the bicep compared to the contralateral side. *Id.* He assessed improving stiffness post-surgery. *Id.* Plaintiff rated his shoulder as 85–90% of normal. *Id.* Dr. Parada instructed Plaintiff to continue progress toward full ROM and to lift weight as tolerated. Tr. at 745–46. He stated "[a]t this point I feel that his shoulder meets acceptable criteria [to] perform the duties as United States soldier." Tr. at 746. He further indicated that Plaintiff did not need a medical board evaluation. *Id.*

Plaintiff returned to Dr. Huh with right ankle pain on April 13, 2016. Tr. at 704. He reported minimal improvement with orthotics and physical therapy and endorsed daily pain and swelling about the hindfoot and midfoot. Tr. at 705. He requested to proceed with surgery, but noted he had a cruise

scheduled for the first week of May and requested that it be scheduled thereafter. Tr. at 705, 706. Dr. Huh noted antalgic gait and multiple abnormal findings in the right lower extremity. Tr. at 705. She reviewed x-rays of the right foot and ankle and an MRI of the right ankle and assessed right posterior tibial tendon dysfunction (stage IIC) with progressive pes planovalgus deformity. *Id.* She scheduled Plaintiff for surgery. Tr. at 706.

On May 19, 2018, Dr. Huh performed right flatfoot reconstruction; right posterior tibial tendon debridement and flexor digitorum longus transfer; right medial displacement calcaneal osteotomy; right lateral column lengthening; right medial cuneiform dorsal opening wedge osteotomy; right peroneus brevis to longus transfer; and right tendo-Achilles lengthening. Tr. at 2433, 3370–81.

Plaintiff followed up with Dr. Huh on June 1, 2016. Tr. at 1325. He was non-weightbearing and his foot was in a splint. *Id.* Dr. Huh observed well-healed incisions without signs of infection, moderate soft tissue swelling, appropriate tenderness, and lightly diminished sensation in the sural nerve distribution. *Id.* She removed Plaintiff's sutures and placed him in a short-leg cast. *Id.* She prescribed Oxycodone 5 mg and instructed Plaintiff to remain non-weightbearing. *Id.*

Plaintiff presented to Dr. Huh for another postoperative visit on June 29, 2016. Tr. at 1299. Dr. Huh placed him in new short-leg cast and indicated

he should remain non-weightbearing for three to four more weeks. Tr. at 1300.

Plaintiff followed up with Dr. Huh on July 28, 2016. Tr. at 1263. He was ambulating with a rolling knee walker and rated his pain as a six. *Id.* Dr. Huh observed well-healed incisions without signs of infection, moderate soft-tissue swelling, tenderness about the lateral column, and lightly diminished sensation in the sural nerve distribution. *Id.* X-rays showed maintained alignment and interval bridging trabecula at the osteotomy sites, diffuse disuse osteopenia, and no evidence of hardware complications. *Id.* Dr. Huh transitioned Plaintiff to a controlled ankle movement ("CAM") boot, instructed him to advance to 50% weightbearing with crutches, and referred him to physical therapy. *Id.*

On July 29, 2016, Plaintiff rated his pain as a six and complained of swelling that subsided upon lying down. Tr. at 1256. Luciano Oquendo, M.D., noted right ankle weakness, limited motion, and TTP. Tr. at 1260. He prescribed acetaminophen 325 mg. *Id.*

Plaintiff complained of pitting edema to his right ankle and foot on August 24, 2016. Tr. at 1220. Nurse case manager Taquisha D. Edwards ("Nurse Edwards"), instructed him to elevate his foot and use massage more often. *Id.*

Plaintiff presented to Peter Christian Johnson, M.D. ("Dr. Johnson"), for orthopedic follow up on August 30, 2016. Tr. at 1212. He reported no difficulty with pain and 50% weightbearing status. *Id.* Dr. Johnson noted mild soft tissue swelling. *Id.* He reviewed x-rays that showed hardware in good position, osteotomy sites with bridging calculus, and osteopenia present. *Id.* He recommended a CAM boot with progressive weightbearing and continued physical therapy. *Id.*

On August 31, 2016, Plaintiff reported reduced edema and indicated he kept his foot elevated and wore compression socks when he could not elevate it. Tr. at 1207. He stated he was attending physical therapy once a week and performing home exercises daily. *Id.* He reported being at 80% weightbearing. *Id.* Nurse case manager Margaret L. Lane ("Nurse Lane"), initiated a care plan during this visit with goals of normal ROM of the right ankle and foot, full weightbearing, and ability to tolerate any unresolved pain. Tr. at 6030. Weekly case management notes from August 31, 2016, through June 20, 2017, include provisions from the care plan for continued physical therapy as needed; continued pain medication as needed and ordered; continued working up to 100% weightbearing as ordered, pushing it, but not so pain becomes intolerable; continued rest; keeping the leg elevated and iced as needed; and wearing an Ace wrap when the leg was not elevated. Tr. at 5550, 5563, 5570, 5575, 5582, 5595, 5609, 5616, 5626, 5637, 5654, 5670,

5677, 5690, 5700, 5719, 5728, 5739, 5748, 5764, 5777, 5785, 5799, 5823, 5829, 5838, 5843, 5861, 5868, 5879, 5887, 5891, 5903, 5912, 5931, 5936, 5946, 5953, 5961, 5984, 6001, 6014, 6023, 6030. The care plan was reviewed approximately once a month over this period. *See id.*

On September 14, 2016, Plaintiff was wearing a CAM boot and reported being at 100% weightbearing twice a day for an hour. Tr. at 1192. He stated he was attending physical therapy, elevating his right lower extremity as often as possible, and wearing compression stockings when he could not elevate it. *Id.*

On October 6, 2016, Plaintiff reported being at 100% weightbearing for two hours twice a day with a CAM boot. Tr. at 1139. He endorsed ankle edema and indicated he continued to participate in physical therapy, elevate his right leg as often as possible, and wear compression stockings when he could not elevate his leg. *Id.*

On November 3, 2016, Plaintiff reported attending physical therapy one to two times a week, as well as aquatic therapy, and rated his pain as a two to three on most days. Tr. at 1089. He endorsed intermittent daily swelling in his right foot. *Id.* He stated he was gradually weaning off the CAM boot, elevating his right lower extremity as often as possible, and wearing compression stockings when he could not elevate it. *Id.*

Plaintiff presented to John Robert Reaume, M.D. ("Dr Reaume"), for orthopedic evaluation on November 10, 2016. Tr. at 1717. He reported having advanced to full weightbearing, but complained of significant right ankle and foot pain that limited his activity. Tr. at 1718. Dr. Reaume observed mild swelling and mild global TTP in Plaintiff's right lower extremity and areas of decreased sensation around Plaintiff's incision sites. *Id.* He instructed Plaintiff to continue to increase his activity as tolerated and noted he was unlikely to be able to return to acceptable and deployable levels of function. *Id.*

The same day, x-rays of Plaintiff's right ankle showed no displaced fracture or malalignment of the ankle; mild-to-moderate anterior tibiotalar joint space narrowing with marginal osteophyte formation, consistent with osteoarthritis; thickened and irregular Achilles tendon shadow, with dystrophic calcifications, consistent with Achilles tendinopathy; sequalae of prior calcaneus osteotomies and open reduction and internal fixation that was incomplete, but appeared to show intact hardware and incomplete healing; and dorsal mid/forefoot open reduction and internal fixation incompletely evaluated, but with a more proximal screw three millimeters proud of the plate. *Id.*

Plaintiff met with nurse case manager Deanna L. Hassler ("Nurse Hassler"), for case management on November 25, 2016. Tr. at 1068. He

reported he continued to experience edema around his ankle. *Id.* Nurse Hassler instructed Plaintiff to continue physical therapy, to elevate his right lower extremity as often as possible, and to wear compression stockings when he could not elevate it. *Id.* She provided the same instructions during a subsequent visit. Tr. at 1065.

Plaintiff followed up with Dr. Johnson on December 22, 2016. Tr. at 1025. He complained of sensitivity over his lateral plantar foot and the dorsum of his foot over his medial cuneiform osteotomy. *Id.* Dr. Johnson noted well-healed surgical incisions, TTP dorsally over the cuneiform osteotomy scar, sensitivity to light touch over the plantar aspect bilaterally, plantar flexion to 30 degrees, and dorsiflexion to 20 degrees. *Id.* He referred Plaintiff for a pain management consultation, prescribed Gabapentin 300 mg three times a day, and instructed him to continue weightbearing as tolerated. Tr. at 1026.

Plaintiff presented to David L. Lindemann, M.D. ("Dr. Lindemann"), for an orthopedic consultation on January 10, 2017. Tr. at 1011. He endorsed pain in his right ankle and the joints of his right foot. *Id.* He reported use of a cane with full weightbearing and described pain over the lateral plantar foot and the dorsum of his foot over his medial cuneiform osteotomy. Tr. at 1012. He endorsed focal swelling and said he used ice and rest as needed. *Id.* He noted he was using Gabapentin 300 mg three times a day without benefit. *Id.*

Dr. Lindemann recommending titrating Gabapentin to 600 mg three times a day and indicated he would consider a trial of Pamelor 10-50 mg, Lyrica, or Effexor if the increased dose of Gabapentin proved ineffective. Tr. at 1013.

Plaintiff presented to Robert Kirtley, M.D. ("Dr. Kirtley"), for evaluation on January 25, 2017. Tr. at 2078. He endorsed neuropathic pain in the dorsum and lateral plantar areas of his right foot that caused marked pain and had increased over the prior months. *Id.* Dr. Kirtley observed that Plaintiff had progressed to full weightbearing with pain and use of a cane. *Id.* Plaintiff described medial plantar sensitivity and jolts of pain radiating proximately up the calf, sensitivity on the dorsum of the foot radiating anteriorly, and focal swelling and pain inferior to the lateral malleolus. *Id.* He reported using ice and resting as needed. *Id.* Dr. Kirtley noted Plaintiff demonstrated hypersensitivities to touch in the medial dorsal foot along the scar and metatarsophalangeal and dorsal surfaces of the great toe and general hyperesthesia over the distribution of the medial dorsal cutaneous nerve. Tr. at 2079. He stated Plaintiff had one very tender focal region near his surgical scar and marked TTP along the midfoot and lateral plantar surface. *Id.* He performed an ultrasound that showed a loose proximal screw with a head that measured 4.1 mm from plate to top of screw. Tr. at 2081. He noted the extensor hallucis longus ("EHL") tendon passed directly over the protruding screw and the expected route of the dorsal cutaneous nerve also

coursed over the EHL near the location, which was consistent with Plaintiff's symptoms. *Id.* He indicated an ovoid/flat hypoechoic area also corresponded with Plaintiff's lateral plantar pain. *Id.* He referred Plaintiff back to orthopedics. *Id.*

Plaintiff presented to podiatrist Michael Lee, D.P.M. ("Dr. Lee"), for bilateral foot pain on February 10, 2017. Tr. at 5770. He rated his pain as a six on the right and a three on the left. *Id.* Dr. Lee noted pain on ROM of the bilateral ankle and foot joints, decreased arch on the left, and pain on palpation of the right foot, especially over the medial midfoot surgical site. Tr. at 5771. He assessed bilateral pes planus and advised Plaintiff to obtain bilateral arch supports. *Id.*

Plaintiff followed up with Dr. Reaume on February 14, 2017. Tr. at 3445. Dr. Reaume noted positive TTP dorsally over the medial cuneiform and mild TTP about the right foot and ankle. Tr. at 3446. He stated Plaintiff was unable to do single limb heel rise due to pain and had decreased sensitivity of the plantar foot. *Id.* He ordered a computed tomography ("CT") scan of the right foot to assess for healing of the osteotomy sites. *Id.*

Plaintiff presented to Jeffrey T. Freeman, M.D. ("Dr. Freeman"), on February 16, 2017. Tr. at 3439. He endorsed increased right ankle pain and indicated his left shoulder was about 70% of normal. *Id.* Dr. Freeman recorded normal findings on exam. Tr. at 3441. He refilled Gabapentin 600

mg and instructed Plaintiff to discuss increasing medication with his pain specialist. *Id.*

Plaintiff followed up with Dr. Reaume to discuss the results of the CT scan on March 14, 2017. Tr. at 5723. Dr. Reaume noted TTP of mild prominence overlying the right first metatarsal. *Id.* He stated the CT scan showed healing of the medial calcaneal slide osteotomy, calcaneal lateral column lengthening, and Cotton first metatarsal plantar flexion osteotomy sites, as well as a prominent dorsal screw at the Cotton osteotomy site. *Id.* He discussed treatment options with Plaintiff, who opted to proceed conservatively. *Id.* Dr. Reaume instructed Plaintiff to follow up if his ankle or foot became increasingly bothersome and he desired to proceed with hardware removal surgery. *Id.*

On March 15, 2017, state agency medical consultant Ramana Reddy, M.D. ("Dr. Reddy"), reviewed the evidence and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and occasionally climb ladders, ropes, or scaffolds. Tr. at 128–30.

Plaintiff rated right ankle pain as a six on March 17, 2017. Tr. at 5703. He indicated Gabapentin was providing only mild benefit. *Id.* His primary care physician, Willis A. McVay, M.D. ("Dr. McVay"), observed Plaintiff to ambulate with a cane and to have TTP to the anterior left shoulder with limited abduction and the right ankle from the instep to the posterior ankle medially and laterally. Tr. at 5706. He recommended Plaintiff continue to follow up with pain management. *Id.*

On May 23, 2017, Plaintiff complained of right ankle pain and swelling that sometimes kept him awake at night, as well as bilateral shoulder pain. Tr. at 5598. Dr. McVay recorded right ankle effusion and TTP in both shoulders in the anterior subacromial area and the right ankle in the lateral and medial sub-malleolar areas. Tr. at 5600.

Plaintiff reported increased pain and swelling in his right ankle on June 20, 2017. Tr. at 5546. His nurse case manager Ivy Jeanne Marks ("Nurse Marks"), discussed comfort measures such as rest, ice, and elevation. *Id.* She noted that the goals of Plaintiff's care plan were unmet. Tr. at 5550.

Plaintiff followed up with Dr. McVay on the same day and rated his right ankle pain as a six. Tr. at 5553. Dr. McVay noted Plaintiff had to ambulate with a cane and was always in a soft shoe. *Id.* He stated Plaintiff's right foot was swollen and he had numbness on the bottom of his foot and

hypersensitivity in his instep area. *Id.* He prescribed Meloxicam 15 mg. Tr. at 5556.

On June 27, 2017, Nurse Marks indicated a change in the care plan with goals for Plaintiff to remain flexible with the medical evaluation board process and to have a smooth transition from the WTB to veteran status. Tr. at 5539.

On July 20, 2017, Plaintiff rated his pain as a five and endorsed numbness in his right lateral foot. Tr. at 5496. Dr. McVay noted TTP on the right ankle mostly at the lateral malleolus, but also on the medial malleolus and the calcaneus. Tr. at 5498. He prescribed a Lidoderm patch and Voltaren gel for pain. Tr. at 5499.

On August 23, 2017, Plaintiff complained of ongoing right ankle pain that bothered him all the time. Tr. at 5443. He rated his pain as a six and indicated it was exacerbated by walking. *Id.* He also endorsed some numbness in the foot. *Id.* He noted Gabapentin was ineffective. *Id.* Dr. McVey observed limited mobility and TTP on the right foot at the instep and along the medial malleolus. Tr. at 5445. He prescribed Lyrica for unspecified mononeuropathy of the right lower limb. Tr. at 5446.

In September 2017, nurse case manager Robert A. Johnson ("Nurse Johnson"), noted Plaintiff's pain control methods and alternative therapies included rest, hot and cold therapy, medication, and elevation. Tr. at 5423.

On September 21, 2017, Plaintiff complained of right ankle swelling and pain that he rated as a six. Tr. at 5410. He described paresthesia on half of the lateral foot and hypersensitivity on the instep. *Id.* He indicated Gabapentin was ineffective and Tramadol was helpful, but made him feel sleepy. *Id.* He stated his orthopedic visit had been rescheduled from the prior week due to a hurricane. *Id.* Dr. McVay noted TTP on the right medial ankle and on the instep of the right foot and limited mobility due to limping on the right foot. Tr. at 5412. He prescribed aspirin, Meloxicam 15 mg, and a Lidocaine patch for Plaintiff's right ankle pain. Tr. at 5413.

During a case management appointment on October 10, 2017, Plaintiff endorsed increased pain and swelling in his right ankle due to increased activity over the prior weekend. Tr. at 5384. He reported having used medication therapy, ice, and elevation with good results. *Id.* During this visit and other case management sessions in September, October, November, and December 2017, Nurse Marks noted Plaintiff's pain control and alternative therapies included rest, hot and cold therapy, medication, and elevation. Tr. at 5287, 5299, 5313, 5322, 5330, 5338, 5357, 5369, 5380, 5387, 5397, 5406, 5431.

Plaintiff presented to Sally A. Corey, M.D. ("Dr. Corey"), on October 24, 2017. Tr. at 5373. He complained of right foot pain that was worsened by wearing combat boots and improved when nothing touched his feet. *Id.* He

further indicated his pain was exacerbated by standing and walking for extended periods. *Id.* Dr. Corey noted pes planus deformity, 3/5 EHL strength, and tenderness to light touch about the entire foot that was particularly pronounced about the dorsal incision and lateral border of the foot. Tr.at 5374. She interpreted x-rays and a CT scan as showing healing of the calcaneal osteotomy, cuneiform osteotomy with prominent screw, lateral column lengthening, and diffuse arthritic changes. *Id.* She discussed treatment options with Plaintiff that included pain management and screw removal surgery. Tr. at 3375. Plaintiff planned to follow up to discuss further operative management. *Id.*

On October 31, 2017, a CT scan showed a posterior lateral screw extending 5 mm dorsal to the dorsal fixation plate of the medial cuneiform osteotomy and other postsurgical and chronic changes to Plaintiff's right foot. Tr. at 6457.

Plaintiff returned to Dr. Huh on November 2, 2017. Tr. at 5343. He reported pain about his lateral hindfoot that required he use a cane. *Id.* Dr. Huh noted she had missed most of Plaintiff's postoperative treatment because she had been deployed. *Id.* She reviewed x-rays that showed nonunion at the lateral column lengthening osteotomy site and a prominent screw that caused hypersensitivity over the dorsal Cotton incision. *Id.* She observed moderate swelling throughout the hindfoot and maximal tenderness

about the lateral calcaneus at the lateral collateral ligament site and dorsal foot at the prominent Cotton osteotomy screw. Tr. at 5344. She noted passive ROM of the right ankle to 10 degrees with dorsal flexion and 35 degrees with plantar flexion and of the hindfoot to 10 degrees with inversion and eversion. *Id.* She indicated Plaintiff had diminished sensation to light touch about the sural and saphenous nerve distributions. *Id.* Dr. Huh noted the incomplete healing explained continued pain and discussed surgical and non-surgical treatment options with Plaintiff. *Id.* She explained that surgery would involve revision lateral column lengthening osteotomy with iliac crest bone autograft and removal of prominent dorsal foot hardware. *Id.* She further indicated Plaintiff would require a bone stimulator to promote healing, given the prior nonunion. *Id.* Plaintiff opted to proceed with surgery. *Id.* Dr. Huh placed him in a CAM boot pending surgery and prescribed calcium and Vitamin D. *Id.*

Dr. Huh performed right Evans osteotomy revision with iliac crest bone graft and right foot hardware removal on December 7, 2017. Tr. at 5268, 8886–8613.

On December 21, 2017, Plaintiff followed up with Dr. Huh for a two-week postoperative visit. Tr. at 5268. He reported minimal pain that was controlled by non-narcotic pain medications. *Id.* Dr. Huh observed no erythema, induration, or ecchymosis around Plaintiff's incision site, mild TTP

about the iliac crest, and mild soft tissue swelling. *Id.* She removed Plaintiff's sutures and transitioned him to a short-leg cast, incorporating a portal for his bone stimulator. Tr. at 5269. She indicated Plaintiff should remain in the cast for four weeks. *Id.*

A January 9, 2018 case management note reflects that Plaintiff was addressing right ankle pain through rest, hot and cold therapy, medication, and elevation. Tr. at 7143.

Plaintiff presented to Dr. McVay for a routine primary care visit on January 16, 2018. Tr. at 5246. He rated his pain as a three and remained non-weightbearing, ambulating with a kneeling scooter. *Id.* He indicated he rarely used Hydrocodone or Tramadol if he was "up too long and had swelling in the foot." *Id.*

On January 17, 2018, x-rays revealed a drill bit fragment in the lateral aspect of Plaintiff's right foot, overlying the anterior portion of the calcaneus and cuboid, as well as degenerative changes in the metatarsophalangeal joint of the great toe. Tr. at 6454. A CT scan of Plaintiff's ankle and foot showed a retained drill bit from the prior surgery measuring 2.1 cm in length that traversed the inferior aspect of the calcaneocuboid articulation and no appreciable bony union at the lateral aspect of the calcaneus or the medial talar dome. Tr. at 6453.

That same day, Dr. Huh explained to Plaintiff the radiographic findings and recommended removal of the drill bit, given its crossing of the calcaneocuboid joint and risk of compromise of the joint. Tr. at 7118. Plaintiff expressed understanding and agreed to proceed with another surgery. *Id.*

On January 25, 2018, Dr. Huh performed a third surgery to Plaintiff's right foot and ankle, removing right foot hardware and fixating the Evans osteotomy site. Tr. at 7009, 8914–8939.

Plaintiff complained of increased pain and swelling on January 30, 2018. Tr. at 7099. He reported taking narcotic pain medication at night and elevating his right foot as needed for swelling. *Id.* Nurse Marks noted Plaintiff's pain control modalities included medication, rest, elevation, and hot and cold therapy. Tr. at 7101.

Plaintiff followed up with Dr. Huh on February 8, 2018. Tr. at 7084. He was in a splint, non-weightbearing, and ambulating with crutches. Tr. at 7085. Dr. Huh noted a well-healed lateral incision without signs of infection, mild soft tissue swelling, and diminished sensation to light touch. *Id.* She removed Plaintiff's sutures, transitioned him to a short-leg cast, and instructed him to follow up in four weeks for transition to a CAM boot. *Id.*

On February 20, 2018, nurse case manager Christine D. Withers ("Nurse Withers"), informed Plaintiff of the signs and symptoms of deep venous thrombosis and instructed him to elevate his right lower extremity

and to use ice as needed. Tr. at 7069. Plaintiff rated his pain as a four and indicated elevating his leg helped with the swelling. *Id.* Nurse Withers conferred with Plaintiff's commander about extending his service, as he was non-weightbearing and was scheduled to be discharged two days after his next follow up with Dr. Huh. *Id.* They agreed to support an extension if they received written approval from Dr. Huh. *Id.* Nurse Withers subsequently received Dr. Huh's written approval of the service extension request and forwarded it to Plaintiff's commander. *Id.*

Plaintiff followed up with Dr. McVay on March 8, 2018. Tr. at 7019. He rated his pain as a four and noted that his foot would swell if he kept it down and that the swelling would reduce if he elevated it. *Id.* Dr. McVay observed Plaintiff to ambulate on a kneeling scooter with his right foot in a cast. Tr. at 7021. He indicated the toes on Plaintiff's right foot had decreased sensation to light touch. *Id.* He supported an extension of Plaintiff's service until April 24, as he felt that his care needed to be managed until he could ambulate. *Id.*

On March 12, 2018, Nurse Withers noted Plaintiff continued to be scheduled to process out of the Army on March 15, 2018. Tr. at 7012. Plaintiff rated his pain as a three and indicated elevating his leg helped his swelling. *Id.* The record further reflects methods of pain control and alternative therapies included rest, cold therapy, medications, and elevation. Tr. at 7015.

Plaintiff followed up with Dr. Huh on March 13, 2018. Tr. at 7009. He was non-weightbearing, in a short-leg cast, and using a bone stimulator. *Id.* Dr. Huh noted a well-healed incision, minimal soft tissue swelling, and diminished sensation to light touch. *Id.* She transitioned Plaintiff to a boot and instructed him to increase weightbearing by 25% per week until he was fully weightbearing and to return in six weeks. *Id.*

On March 15, 2018, Nurse Withers noted that Plaintiff's request for an extension had been denied. Tr. at 7007.

Plaintiff presented to nurse practitioner Kimberly Eaker ("NP Eaker"), to establish care on April 16, 2018. Tr. at 9132. NP Eaker noted Plaintiff was ambulating with bilateral crutches and wearing a special boot on the right foot. *Id.* She advised Plaintiff to use Lidocaine cream three times daily, to use Diclofenac gel four times daily, and to use a rest-ice-compression-elevation ("RICE") protocol two-to-three times daily to manage right foot pain. Tr. at 9133.

On May 22, 2018, Plaintiff reported he had been weightbearing in shoes over the prior couple of weeks without issues and continued to use the bone stimulator. Tr. at 9044. He endorsed intermittent pain about the lateral hindfoot and ankle and numbness about the lateral foot in the sural nerve distribution, but noted his pain had improved. *Id.* Dr. Huh observed antalgic gait with no assistive device, mild soft tissue swelling in the right foot,

passive ROM of the right ankle to 10 degrees of dorsiflexion and 35 degrees of plantar flexion, passive ROM of the right hindfoot to 10 degree of eversion and 25 degrees of inversion, and diminished sensation to light touch in the sural nerve distribution. *Id.* She reviewed a CT scan and noted it showed bridging trabecula across greater than 50% of the Evans osteotomy site and no evidence of hardware complication. Tr. at 9045. She instructed Plaintiff to continue weightbearing in shoes with orthotics and using the bone stimulator for two additional months. *Id.*

State agency medical consultant Irene Richardson, M.D. ("Dr. Richardson"), reviewed the records on June 25, 2019, and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; avoid operation of foot pedals with the right lower extremity; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to hazards. Tr. at 155–58. On August 28, 2019, state agency medical consultant Lindsey Crumlin, M.D. ("Dr. Crumlin"), assessed a similar physical RFC, except that she found Plaintiff could occasionally climb ladders, ropes, or scaffolds. *Compare* Tr. at 155–58, *with* Tr. at 173–76.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff testified that he lived with his wife and four-month-old son. Tr. at 46. He stated he had worked full-time for the Department of the Army since May 2018. Tr. at 47. He noted he had previously worked for the Army Reserves. *Id.* He stated he had been transferred to the WTB following an injury in 2014. Tr. at 48. He indicated he had continued to receive his pay while he was assigned to the WTB because he was on military duty at the treatment facility. Tr. at 49. He stated he attended appointments and classes and engaged in physical and occupational therapy and other treatment after December 2014. Tr. at 48–49. Plaintiff stated had also completed courses and obtained a master's degree over this period. Tr. at 49.

Plaintiff testified that prior to being injured, he had worked as a mechanic, a mechanic supervisor, and an observer controller trainer for the Army. Tr. at 50–51. He stated he fell into a six-foot hole, injuring his ankle and shoulder, while training a unit for mobilization. Tr. at 56–57. He said his arm was in a sling when he entered the WTB and he was immediately scheduled for surgery in February, as he had already attempted physical therapy. Tr. at 57. Plaintiff admitted the surgery helped his left shoulder, though he could no longer use it as well as he had prior to the injury. *Id.* He

said he participated in physical therapy for his shoulder until around November 2015. Tr. at 58. He indicated that after completing physical therapy, his left shoulder function was restored to 65% to 70% of its baseline. *Id.*

Plaintiff testified he had been required to wait for his shoulder to heal prior to undergoing right ankle surgery, as he would require crutches to ambulate following the surgery. Tr. at 59. He stated he was wearing a boot on his ankle and using a cane when he first entered the WTB. *Id.* He indicated he could not be on his feet for more than 10 to 15 minutes at a time without experiencing swelling and increased pain. *Id.* He stated he had tried orthopedic shoes and inserts and had participated in physical therapy three days a week prior to undergoing ankle surgery. Tr. at 59–60. He stated he kept his foot propped up or iced if he was not attending an appointment or ambulating for a brief period. Tr. at 60. He stated he used a machine that circulated water and ice around his ankle. *Id.*

Plaintiff testified that he underwent his first ankle surgery in May 2016. Tr. at 62. He stated he was required to stay off his right ankle for two weeks following the surgery. *Id.* He said he was then placed in a cast for eight weeks prior to being placed in a boot and remained non-weight-bearing throughout that process. *Id.* He explained that he had a knee walker for ambulation. Tr. at 63. He said that he started physical therapy after being

placed in the boot. *Id.* He indicated that after about four weeks of physical therapy, he started walking on soft surfaces with assistance and progressed to using a treadmill-like machine that prevented him from fully bearing weight. *Id.* He stated he was not able to bear weight on his right ankle until around November or December 2016. Tr. at 63–64. He noted he ambulated with a cane thereafter, and his right ankle continued to swell. Tr. at 64.

Plaintiff testified that he was referred to pain management, where his provider discovered a screw in his ankle was starting to come out and required intervention. Tr. at 64–65. He noted that he had previously started the medical board process and could not proceed with surgery while that process was ongoing. Tr. at 65. He further explained that the surgeon who performed his right ankle surgery had deployed in July 2016 such that he was initially unable to follow up with her. *Id.* He stated the Army had planned to medically retire him in January 2018 and for him to undergo additional surgery to his right ankle immediately thereafter. Tr. at 65–66. However, he indicated that his surgeon returned in October 2017 and he underwent x-rays prior to a visit with her. Tr. at 66. He stated that upon reviewing the x-rays, his surgeon contacted him and requested he follow up immediately. *Id.* He indicated his surgeon explained that he was continuing to experience pain and swelling in his right ankle because the bone had not healed from the prior surgery. *Id.*

Plaintiff testified he underwent a second surgery to his right ankle to remove the screw and address the bone issue in December 2017. Tr. at 66–67. He stated that after the surgery, his doctor realized that a drill bit remained in his ankle that required a third surgery to remove. Tr. at 67.

Plaintiff stated that the Army had changed his retirement date twice because of the surgeries. Tr. at 68. He said he requested that his doctor release him to return to work in May. *Id.* He indicated his surgeon agreed to allow him to return to work, provided that he could elevate his right foot, keep it iced, and attend physical therapy. *Id.*

Plaintiff testified that he was presently performing a desk job over an eight-hour workday and 40-hour workweek. Tr. at 61, 68–69. He stated he propped up his right ankle and used the ice machine on it while he was working. Tr. at 61. He said he had started using a transcutaneous epidural nerve stimulation ("TENS") unit on his ankle the prior July or August and continued to use it at work. Tr. at 61–62. He stated his employer accommodated his needs to prop his ankle and use the ice machine and TENS unit and that his coworkers sometimes helped to fill his ice machine. Tr. at 69.

Plaintiff denied that he would have been able to walk for more than 30 minutes at a time between December 30, 2014, and May 17, 2018. *Id.* He stated he had initially intended to obtain treatment through the WTB and

return to duty, but realized in February 2016 that he would not be able to return to duty. Tr. at 70. He noted the Army had considered whether he would have sufficient functioning to be deployable and to perform his prior job. Tr. at 70–72. He confirmed that he retired from the Army on March 15, 2018. Tr. at 73.

Plaintiff testified that he had begun a relationship with his wife in 2015. Tr. at 74. He indicated he had lived in the treatment facility barracks at both Fort Gordon and Fort Stewart. *Id.* He confirmed that he was able to bathe and dress himself and care for his personal grooming and hygiene over the relevant period. Tr. at 75. He stated he had a 25-year-old daughter in addition to his new baby. Tr. at 75–76. He said he was expected to keep his barracks clean while in the WTB, but that the Army provided contractors to assist him if he was unable to do so. Tr. at 76. He noted his roommate also assisted him immediately following surgeries. *Id.* He denied having to prepare his own meals. Tr. at 77. He said he stopped driving the day prior to his first ankle surgery and did not resume driving until January or February 2017. Tr. at 78. He stated he was transported to some of his medical appointments and was sometimes able to use his kneeling scooter to ambulate the two-to-three blocks to the facility. Tr. at 79.

Plaintiff testified that he earned his master's degree in December 2017. Tr. at 80. He said his classes were all online, allowing him to complete them

while lying down with his foot propped up. *Id.* He indicated he started the master's program in August 2015 and completed 36 credit hours by taking one class every eight weeks. *Id.* He admitted that he traveled with a family member to Jackson, Mississippi, around November 2015. Tr. at 81–82. He stated the trip took seven to seven-and-a-half hours and he stopped every two hours to walk around for a little bit. Tr. at 82. In response to the ALJ's question as to a reference to walking for exercise in February 2016, Plaintiff explained that his physical therapist had advised him to walk a couple times a week for five to 15 minutes at a time. Tr. at 83. In response to the ALJ's question as to a reference to moderate exercise of 30 minutes a day in December 2014, Plaintiff explained that physical therapy was considered moderate exercise. Tr. at 83–84. Plaintiff admitted that he had brought no cane or other assistive device to the hearing. Tr. at 84. He stated he was "trying [his] best not to use it," but still required a cane three to four times a week. *Id.* He said he was using crutches and a knee walker prior to his return to work in May 2018. Tr. at 85. He noted he used the knee walker until he graduated to using a cane in July 2018. Tr. at 86.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Jacqueline Kennedy-Merritt reviewed the record and testified at the hearing. Tr. at 87–96. The VE categorized Plaintiff's PRW as a diesel mechanic, *Dictionary of Occupational Titles*

("*DOT*") number 625.281-010, as requiring heavy exertion and having a specific vocational preparation ("SVP") of 7. Tr. at 88. She stated Plaintiff performed work as a diesel mechanic along with work as a supervisor, *DOT* number 620.131-014, requiring light exertion with an SVP of 7, making it a composite job. *Id.* She testified Plaintiff also worked as a survival specialist, *DOT* number 378.227-018, which required very heavy exertion and had an SVP of 5, and a field artillery operations specialist, *DOT* number 378.367-014, which required light exertion and had an SVP of 5. Tr. at 88–89.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift, carry, push, and pull up to 20 pounds occasionally and up to 10 pounds frequently; stand and/or walk for a total of two hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; never crawl or climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; frequently engage in overhead reaching with the left upper extremity; and frequently push, pull, and operate foot controls with the right lower extremity. Tr. at 89. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 90. The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. Tr. at 91. The VE identified light jobs with an SVP of 2 as a toll collector, *DOT* number 211.462-038, an information clerk, *DOT* number 237.367-018, and a final inspector,

DOT number 727.687-054, with 61,000, 60,000, and 55,000 positions in the national economy, respectively. *Id.*

The ALJ asked the VE if there were jobs at the sedentary level that would be consistent with the restrictions in the RFC assessment. *Id.* The VE identified sedentary jobs with an SVP of 2 as a document preparer, *DOT* number 249.587-018, a final assembler, *DOT* number 713.687-018, and an addresser, *DOT* number 209.587-010, with 75,000, 51,000, and 39,000 positions in the economy, respectively. Tr. at 92.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first question and must be permitted to use an ambulatory assistive device such as a single-tipped cane on an as-needed basis for walking, with the contralateral extremity capable of lifting, carrying, pushing, and pulling up to the exertional limits. *Id.* He further specified that the individual could engage in no more than 30 minutes of consecutive standing and walking throughout the workday, would be limited to a total of two hours of standing and walking in an eight-hour workday, and could occasionally push, pull, and operate foot controls with the right lower extremity. Tr. at 92–93. The ALJ asked the VE if the individual would be able to perform any jobs. Tr. at 93. The VE testified that the individual would be able to perform the same jobs she had previously

36

identified at the sedentary and light exertional levels and that those jobs would exist in the same numbers. *Id.*

The ALJ asked the VE to indicate the maximum amount of time that an employee could be off task throughout the course of a workday before an employer would find it intolerable. *Id.* The VE stated that over 10 percent of the time off-task would preclude employment. Tr. at 94.

The ALJ asked the VE if her testimony was consistent with the information contained in the *DOT*. *Id.* The VE testified that her opinions as to an individual being off-task, use of an assistive device to walk, contralateral extremity use, overhead reaching, and sitting, standing, and walking limitations were based on a reasonable degree of vocational certainty, given her education, training, and experience, as the *DOT* did not address such issues. *Id.* She further confirmed that the *DOT* addressed bilateral, as opposed to unilateral, use of extremities. Tr. at 95.

Plaintiff's counsel asked the VE to consider the individual the ALJ described in the first question and to further assume that the individual would always need to elevate one lower extremity while seated. *Id.* He asked how the additional restriction would affect the jobs the VE previously identified. *Id.* The VE asked for clarification as to how high the lower extremity would need to be elevated. *Id.* Plaintiff's counsel clarified that it would be to at least waist-level. *Id.* The VE testified that the combination of

restrictions would preclude the jobs she identified and all other employment.

Tr. at 95–96.

      2.    The ALJ's Findings

In his decision dated March 25, 2020, the ALJ made the following

findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.
2. The claimant did not engage in substantial gainful activity from December 30, 2014, through May 17, 2018, the closed period of disability alleged (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: status post TEN-ex and rotator cuff repair surgeries of the left shoulder; status post right ankle/foot surgeries (three) with residual degenerative joint disease, tendinopathy, and neuralgia; bilateral pes planus; and degenerative joint disease of the bilateral feet (20 CFR 404.1520(c)).
4. The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 during the period at issue (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, the undersigned finds that, during the specific period alleged, the claimant had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) in that he could lift, carry, push, and pull up to twenty pounds occasionally and ten pounds frequently. He could stand and/or walk for a total of two hours in a workday but for no more than thirty consecutive minutes; and sit for about six hours in a workday. He required an ambulatory assistive device, such as a single-tipped cane, on an as-needed basis for walking, with the contralateral upper extremity capable of lifting, carrying, pushing, and pulling up to the specified exertional limits. He could occasionally balance, stoop, kneel, crouch, and climb stairs and ramps, but never crawl or climb ladders, ropes, and scaffolds. He could frequently engage in overhead reaching with his left upper extremity and could occasionally push, pull, and operate foot controls with his right

lower extremity. He would have been off-task for about 10% of the workday, exclusive of regularly scheduled breaks.

6. The claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April 30, 1974, and was 40 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563). He was 44 years old at the end of the closed period of disability alleged.

8. The claimant has more than a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed during the closed period alleged (20 CFR 404.1569, and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, from December 30, 2014, through May 17, 2018, the closed period alleged (20 CFR 404.1520(g)).

Tr. at 17–25.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not explain his RFC assessment in accordance with SSR 96-8p; and

2) the ALJ failed to properly evaluate Plaintiff's subjective allegations as to his symptoms.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4)

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).
[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d

287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.   Analysis

1.   RFC Assessment

Plaintiff argues the ALJ did not explain the RFC assessment in accordance with SSR 96-8p. [ECF No. 20 at 14]. He maintains the ALJ

cherrypicked the evidence and failed to comply with the provisions in SSR 96-9p in assessing whether he required a hand-held assistive device for standing. *Id.* at 16–20. He claims the ALJ did not explain why he declined to include a provision for elevation of the right lower extremity. *Id.* at 20–21.

The Commissioner argues that substantial evidence supports the RFC assessment. [ECF No. 22 at 16]. He maintains the ALJ did not err in failing to provide a provision for Plaintiff's use of a cane while standing because the evidence does not support such a need. *Id.* at 17–19. He contends the ALJ accounted for the medical evidence and Plaintiff's pain complaints in the RFC assessment by limiting him to sedentary work that required standing and walking for no more than 30 consecutive minutes, permitted used of an ambulatory device as needed for walking, and required no more than occasional pushing, pulling, or operating foot controls with the right leg. *Id.* at 19. He claims the ALJ was not required to include a provision for elevation of Plaintiff's right lower extremity because none of his physicians indicated the limitation and the record did not support it. *Id.* at 20–22.

A claimant's RFC represents "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ should consider all the relevant evidence and account for all the claimant's medically-determinable impairments in the RFC assessment. 20 C.F.R. § 404.1545(a)(1), (2). He must include a narrative discussion that cites "specific medical facts (e.g.,

laboratory findings) and non-medical evidence (e.g., daily activities, observations)" and explains how all the relevant evidence supports each conclusion. SSR 96-8p, 1996 WL 374184, at *7 (1996). "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288 (4th Cir. 2013).

The ALJ must "consider all of the claimant's 'physical and mental impairments, severe and otherwise, and determine, on a function-by-function basis, how they affect [the claimant's] ability to work.'" *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (quoting *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016)). Although in *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), the court declined to adopt a per se rule requiring remand where an ALJ fails to engage in a function-by-function analysis, it did so because "remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" Nevertheless, the court stated that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The Fourth Circuit has provided additional guidance in recent cases as to its expectations for RFC assessments. In *Thomas*, 915 F.3d at 311, it explained that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." In *Dowling v. Commissioner of Social Security Administration*, 986 F.3d 377, 387 (4th Cir. 2021), the court emphasized the requirement that the ALJ explicitly follow the regulatory framework in 20 C.F.R. § 404.1545 and SSR 96-8p and engage in a function-by-function analysis as to relevant functions in assessing a claimant's RFC. After noting the ALJ's failure to follow the correct regulatory framework, the court wrote:

> Instead, the ALJ's RFC determination was based entirely on SSRs 96-7p and 16-3p, which set out the process ALJs use to "evaluate the intensity and persistence of [a claimant's] symptoms" and determine "the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the record." SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017). Of course, a claimant's symptoms, and the extent to which the alleged severity of those symptoms is supported by the record, is relevant to the RFC evaluation. *See* 20 C.F.R. § 416.945(a)(3) (stating that when evaluating an RFC, an ALJ should consider "limitations that result from the claimant's symptoms, such as pain"). But an RFC assessment is a separate and distinct inquiry from a symptom evaluation, and the ALJ erred by treating them as one and the same.

*Id.*

The ALJ in this case engaged in the same flawed analysis as the ALJ in *Dowling*. He set forth the RFC and discussed the evidence he considered to support it, addressing 20 C.F.R. § 404.1529 and SSR 16-3p, which pertain to

46

evaluation of subjective symptoms, but nowhere referencing 20 C.F.R. §
404.1545 or SSR 96-8p, which address the RFC assessment. *See* Tr. at 19–23.
His summary and weighing of the evidence serve as an insufficient
explanation for the assessed RFC, providing no reason for the individual
restrictions he included therein. He failed to engage in a function-by-function
analysis, neglecting at least one relevant function and rendering the RFC
assessment unsupported by substantial evidence.

Plaintiff raises a meritorious argument as to the ALJ's consideration of
evidence regarding elevation of the right lower extremity. Although the ALJ
acknowledged Plaintiff's testimony that "[d]uring that time, he had to keep
his right foot elevated or on ice, and he continues to use ice and elevate it
even now," Tr. at 20, he neither specifically rejected a restriction for elevation
of the right foot, nor included a provision for elevation in the RFC
assessment. To the extent his decision may be construed as suggesting he
rejected a provision for elevation of the right foot as unsupported by the
record, the undersigned notes that such a conclusion should not have been
reached without the ALJ having resolved evidence to the contrary. The
evidence arguably supports elevation of the right foot over the relevant
period, as it includes numerous references between 2016 and 2018 to
elevation of the right foot, including Plaintiff's reports that he did so
routinely, providers' instructions to do so, and care plans that included it as a

treatment modality. *See* Tr. at Tr. at 1065, 1068, 1089, 1139, 1192, 1207, 1220, 5287, 5299, 5313, 5322, 5330, 5338, 5357, 5369, 5380, 5384, 5387, 5397, 5406, 5423, 5431, 5546, 5550, 5563, 5570, 5575, 5582, 5595, 5609, 5616, 5626, 5637, 5654, 5670, 5677, 5690, 5700, 5719, 5728, 5739, 5748, 5764, 5777, 5785, 5799, 5823, 5829, 5838, 5843, 5861, 5868, 5879, 5887, 5891, 5903, 5912, 5931, 5936, 5946, 5953, 5961, 5984, 6001, 6014, 6023, 6030, 7012, 7015, 7019, 7069, 7099, 7101, 7143, 9133. The VE testified that an individual who would be required to elevate one lower extremity at waist-level while sitting would be unable to perform any jobs existing in significant numbers in the economy. Tr. at 95–96. The record is not clear as to how often Plaintiff was elevating his right foot and does not definitively establish that he would have had to do so throughout an eight-hour day during the relevant period. Nevertheless, the evidence suggests that the ALJ either should have included some provision for elevation of the right foot in the RFC assessment or given a specific and logical explanation for declining to include such a provision. Because the ALJ failed to assess this relevant function, remand appears to be appropriate. *See Mascio*, 780 F.3d at 636.

Given the record before the court, the undersigned declines to find that the ALJ erred in failing to include a provision in the RFC assessment for Plaintiff's use of a cane while standing. "To find that a hand-held assistive device is medically required, there must be medical documentation

48

establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7 (1996). Plaintiff has failed to cite medical documentation establishing that he required a cane while standing, and the undersigned's review of the record yields no such documentation. Dr. Huh indicated Plaintiff should be non-weightbearing or partially weightbearing for brief periods primarily following surgeries, but the restrictions were temporary. *See* Tr. at 1263, 1300, 1325, 5269, 5344, 7004, 7085. Other providers described Plaintiff as using a cane, crutches, and a knee walker or kneeling scooter to ambulate, but none of them provided any specific indications as to the conditions under which Plaintiff required an ambulatory assistive device. *See* Tr. at 2078, 5246, 5553, 5706, 7021, 9132. In the absence of any evidence to support inclusion in the RFC assessment for use of a cane while standing, substantial evidence supports the ALJ's exclusion of such a restriction.

### 2.    Subjective Symptom Evaluation

Plaintiff argues the ALJ failed to properly evaluate his allegations as to the effects of his impairments. [ECF No. 20 at 21]. He maintains the ALJ did not explain how the evidence refuted his reports of disabling pain. *Id.* at 22–24. He notes that he was able to perform the activities the ALJ cited while

sitting and elevating his leg, an action the VE testified was inconsistent with competitive employment. *Id.* at 24. He contends that his return to work was only possible because his employer allowed him to work with his foot elevated and to ice his ankle during the day. *Id.* at 25.

The Commissioner argues the ALJ considered all of Plaintiff's subjective complaints and reasonably explained that they were not entirely consistent with the medical and other evidence. [ECF No. 22 at 23]. He maintains the ALJ's consideration of Plaintiff's subjective allegations may be differentiated from the ALJ's erroneous assessment in *Arakas v. Commissioner, Social Security Administration*, 983 F.3d 83, 98 (4th Cir. 2020), because: (1) this case involved discrete physical impairments that could be evaluated through objective testing, unlike fibromyalgia; (2) the ALJ did not mischaracterize the material facts in noting inconsistencies between Plaintiff's subjective complaints and his activities of daily living ("ADLs"); and (3) the ALJ considered Plaintiff's ADLs in the context of the entire record instead of in a conclusory manner. *Id.* at 26–28.

In all cases, "an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis*, 858 F.3d at 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. §

404.1529(b)). The ALJ only proceeds to the second step if the claimant's impairments could reasonably produce the symptoms he alleges. *Id.* At the second step, the ALJ is required to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). He must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6 (2016). However, he must not evaluate the claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4; *see also Arakas*, 983 F.3d at 98 ("We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

In evaluating the alleged limiting effect of a claimant's symptoms, the ALJ is to consider other evidence that "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms . . . as well as the factors set forth in [the] regulations." SSR 16-3p, 2016 WL 1119029, at *5; *see also* 20 C.F.R. § 404.1529(c) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures

51

other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms). The ALJ is required to explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2016 WL 1119029, at *8. He must evaluate the "individual's symptoms considering all the evidence in his or her record." *Id.*

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the impairments he alleged, but that his "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in this record for the reasons explained in this decision." Tr. at 20. The ALJ discussed imaging reports, physical therapy, steroid injections, surgeries, some of Plaintiff's providers' observations, and his weightbearing ability at various times. Tr. at 20–21. He wrote:

> The clinical picture reflected in these treatment records shows quite limited objective findings to support the disabling limitations asserted by the claimant for the closed period alleged. After the significant surgery to his left shoulder early in 2015, by August of that year, his treating doctor found him able to perform at least sedentary work. His shoulder continued to improve into the next year, when his ankle and foot became the more primary focus of his treatment. Prior to his first ankle surgery in 2016, he had some complaints of pain after spraining the ankle and demonstrated some deficits. However, he remained independent

in his activities of daily living, continued to walk for exercise several times per week without an assistive device in spite of pain, continued to drive, and enjoyed tailgating at Georgia Tech football games. After that surgery, two doctors noted his return to full weight bearing by the end of 2016, well within twelve months after the surgery. The records show that he was walking twice per day for an hour, consistent with the sedentary work restrictions described above. He had two further surgeries, in December 2017 and January 2018, and was again weight bearing in regular shoes by May 2018. During this time, he was also taking classes and received a Master's degree. After his retirement from the Army, he was able to return to sedentary work within a short period and does not allege disability since that time. The ongoing clinical findings from his treating sources support the residual functional capacity described above for the specific period alleged.

Tr. at 21–22.

The ALJ further stated Plaintiff's statements were "inconsistent because the medical evidence of record does not support the disabling limitations he alleged for the period required by the Social Security Act." Tr. at 22. He referenced Plaintiff's testimony that "he began walking within four weeks after his use of a surgical boot ceased and that he was able to walk without crutches or a cane by November or December 2016." *Id.* He also indicated Plaintiff had "acknowledged that the shoulder surgery improved the function of his shoulder and that his function had remained essentially the same since he ceased physical therapy for the shoulder." *Id.* He stated Plaintiff's doctors' notes "do not show that he reported to them limitations of the extreme severity he described." *Id.*

As discussed above, Plaintiff's providers' notes contain many references to Plaintiff's complaints of pain and representations that he iced and elevated his right foot to relieve pain and swelling. In addition, his physicians observed right lower extremity swelling or edema during multiple visits. *See* Tr. at 852, 880, 1212, 1263, 1325, 1718, 5268, 5344, 5600, 7009, 7085, 9044. Thus, the ALJ's conclusion to the contrary is unsupported.

It appears the ALJ focused on the objective evidence and Plaintiff's ability to bear weight as contrary to his representations as to the effects of pain and a need to elevate his right foot. However, Plaintiff's ability to bear weight does not prove the absence of pain or conflict with a need to ice and elevate the right foot at times. Because Plaintiff had medical conditions that reasonably could be expected cause the symptoms he alleged, he was "entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of [his] symptoms." *See Arakas*, 983 F.3d at 98. This case differs from *Arakas* in that Plaintiff is not diagnosed with fibromyalgia, an impairment that presents few objective signs. Nevertheless, the court's analysis of subjective symptom evaluation in *Arakas* is not limited to cases involving fibromyalgia. In fact, the court specified that it is "long standing law in our circuit" that claimant's may rely on subjective evidence alone to support their allegations as to the severity of their impairments. *See id.*

In contravention of SSR 16-3p, the ALJ reached his conclusion as to the consistency of Plaintiff's statements without considering the entire record. Although he cited activities that included walking for exercise, driving, tailgating at football games, completing courses to earn a master's degree, and returning to sedentary work a short time after his retirement from the Army, these activities do not refute Plaintiff's allegations as to a need to elevate and ice his right foot or show that his pain was less than he alleged. Plaintiff qualified these activities, noting that his physical therapist had advised him to walk a couple times a week for five to 15 minutes at a time, Tr. at 83, that physical therapy sessions were credited as 30 minutes of exercise, Tr. at 83–84, that he stopped driving the day prior to his first ankle surgery and did not resume driving until January or February 2017, Tr. at 78, that he earned his master's degree by completing one online course every eight weeks between August 2015 and December 2017 while lying down with his foot propped up, Tr. at 80, and that he was only able to return to work because he was provided concessions for propping up and icing his right foot while performing a desk job, Tr. at 61. The Fourth Circuit has noted that "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which []he can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis in original) (citing

*Brown v. Commissioner*, 873 F.3d 251, 263 (4th Cir. 2017)). Here, the ALJ did not address Plaintiff's qualifications of the cited activities.

The ALJ also failed to explain which of Plaintiff's symptoms he found consistent or inconsistent with the record and how his evaluation of Plaintiff's symptoms led to his decision as to which restrictions to include and exclude from the RFC assessment. *See* SSR 16-3p, 2016 WL 1119029, at *8. The ALJ's conclusion as to the intensity, persistence, and limiting effect of Plaintiff's symptoms is not supported by substantial evidence, given his incomplete and inaccurate assessment of the relevant evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

April 2, 2021                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge